THOMAS McCAFFREY, JR., AND LILLIAN S. McCAFFREY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 63992.    Filed December 11, 1958.

*Robert G. MacAlister, Esq.*, for the petitioners.
*David L. Ketter, Esq.*, for the respondent.

WITHEY, *Judge:* The respondent determined a deficiency of $11,082.10 in the income tax of the petitioners for 1953. The only issue presented for decision is whether the petitioners are entitled to the nonrecognition of gain exemption provided for in section 112 (f) of the Internal Revenue Code of 1939, with respect to a transaction wherein real property used for a parking lot was taken by condemnation proceedings by the Commonwealth of Pennsylvania and the proceeds received by petitioner Thomas McCaffrey, Jr., from the condemnation proceedings were used by him to purchase stock in the acquisition of control of a corporation which, for the purpose of leasing for use as a warehouse, purchased vacant improved real property which it leased for warehouse purposes.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

The petitioners are husband and wife, with Royal York Apartments, Pittsburgh, Pennsylvania, as their mailing address. The peti-

tioners filed their joint individual Federal income tax return for 1953 with the district director in Pittsburgh, Pennsylvania.

Since only petitioner Thomas McCaffrey, Jr., was involved in the transaction under consideration herein, the term petitioner sometimes hereinafter will be used to refer to him. Since 1923 the petitioner has been engaged in the business of an industrial realtor and appraiser.

In 1947, and at a cost of $15,000, the petitioner acquired an interest as one of two coowners in certain real property located at 556–562 Second Avenue in the First Ward of Pittsburgh, Pennsylvania, and sometimes hereinafter referred to as the Pittsburgh property.

In 1923 and for an undisclosed period thereafter prior to 1947 the Pittsburgh property was used as a coal yard under a lease arrangement with the owner of an adjacent property. The neighboring properties were industrial in nature. The Pittsburgh property in 1923 was rectangular in shape with dimensions of 80 feet by 180 feet fronting on Second Avenue, was served by a railroad siding of the Pennsylvania Railroad, and had no buildings on it.

When the petitioner acquired his interest in the property in 1947, the dimensions of the property were the same as stated above. The property had been filled, graded, and black topped. Other than the grade that accommodated the leveling, the property was level with the street. The railroad siding still served the property. The property also was served by the usual utilities—water, gas, electricity, and telephone. There was on the property a small frame building which was adaptable for use only in the operation of a parking lot. Even though there had been some changes in ownership since 1923, the neighboring properties continued to remain substantially industrial in nature.

At the time the petitioner acquired his interest in the Pittsburgh property in 1947, Buford B. Epstein owned a property adjacent to and approximately of the same area as the Pittsburgh property. At that time Epstein, using his own property and the Pittsburgh property on which he held a lease, was engaged in the business of conducting a parking lot operation thereon. Throughout the entire period the petitioner owned an interest in the Pittsburgh property the property was leased to Epstein who continued to use it and his own property in the conduct of his parking lot operation. The leases from the petitioner and his coowner to Epstein ran for a period of 1 year, provided that the property should be used only for parking purposes, and contained a "sales clause" under which the owners in the event of the sale of the property could cancel the lease effective as of the first day of any month by giving Epstein 30 days' previous notice.

In 1952 the Commonwealth of Pennsylvania condemned the Pittsburgh property and in 1953 paid in condemnation to the petitioner for his interest therein the sum of $57,477.27. The excess of the con-

demnation proceeds over the cost to the petitioner for his interest in the property was $42,477.27.

After the petitioner received notice of the condemnation of the Pittsburgh property he investigated the possibility of obtaining within the downtown limits of Pittsburgh an industrial property of similar size but was unable to find any "to accommodate my [his] desires." The petitioner then made an investigation in other cities and other counties. He found available in the city of New Castle, Pennsylvania, which is in western Pennsylvania and about 50 miles distant from Pittsburgh, a 9⅓-acre tract of industrially zoned real estate situated on Industrial Street in New Castle, then owned by American Can Company and sometimes hereinafter referred to as the New Castle property. On the tract was a building [1] 2 stories in height of brick and wood construction with concrete and wood floors, equipped with elevators, sprinkler system, and heating system, and of overall dimensions of 694 feet by 80 feet. Also on the tract were an engine room, garages, and lumber shed. The New Castle property was situated in an industrial neighborhood, was served by two Baltimore & Ohio Railroad sidings, and had all necessary utilities available. An undisclosed portion of the tract was surfaced with black top and cinder and was used for parking purposes by executives, employees, and customers of a corporation conducting business on an adjacent tract. Another portion of the New Castle property had cinder surfacing for use in parking incidental to loading shipments by rail. American Can Company had been offering the New Castle property for sale since 1951 and the buildings were vacant and not in a tenantable condition.

When the petitioner learned of the availability of the New Castle property, he also learned that the Federal Civil Defense Administration, sometimes hereinafter referred to as Civil Defense, had previously considered leasing the property but had declined to lease it because of the physical condition of the buildings. Thereupon the petitioner went to Washington, D. C., and began negotiations with Civil Defense for the latter to lease the property for use in storing about 20 million dollars worth of materials. After obtaining a commitment from Civil Defense to lease the property provided certain repairs, alterations, and improvements were made, the petitioner negotiated the purchase of the property by Arsenal Corporation, a Pennsylvania corporation, from American Can Company at a price of $155,000 of which $105,000 was represented by a mortgage on the property to American Can Company.

On August 14, 1953, and at a cost of $64,029.45, the petitioner purchased all of the issued and outstanding shares of the capital

---

[1] Sometimes referred to in the record as one building and sometimes as building Nos. 1 and 2.

stock of Arsenal Corporation. At that time Arsenal's assets consisted of the New Castle property as heretofore described.

During 1953, Arsenal Corporation leased the New Castle property to Civil Defense on a year-to-year basis for use for warehouse purposes and thereafter expended approximately $100,000 in making the repairs, alterations, and improvements to the property required by the lease. Civil Defense required that the property be fenced and such use as was made of the property for parking purposes was only that which was incidental to Civil Defense's occupancy of the property. In fixing the rent paid by Civil Defense for the property, the petitioner did not include any amount as a charge for the use of the property for parking purposes.

In determining the deficiency in question the respondent determined that the petitioner was not entitled to the benefits of the nonrecognition of gain provisions of section 112 (f) of the 1939 Code and determined that the gain of $42,477.27 realized from the condemnation of petitioner's interest in the Pittsburgh property constituted long-term capital gain taxable to the petitioner for 1953.

OPINION.

The only issue for decision is whether the petitioner in purchasing all of the capital stock of Arsenal Corporation and thereby acquiring control of it, acquired control of a corporation owning "property similar or related in service or use to the" Pittsburgh property within the meaning of the nonrecognition of gain provisions of section 112 (f) of the 1939 Code, pertinent portions of which are set out below.[2]

In substance the petitioner requests that we conclude that he has established that the Arsenal Corporation's "industrial property" was "property similar" to his "industrial property," which was condemned, as contemplated by the pertinent provisions of the Code.

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(f) INVOLUNTARY CONVERSION.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

    \*        \*        \*        \*        \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph :

(A) Nonrecognition of Gain.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary may by regulations prescribe. \* \* \*

We pointed out in *Steuart Bros., Inc.*, 29 T. C. 372 on appeal (C. A. 4), that the test applicable in determining whether properties are "similar or related in service or use" is the "functional" test. In support of our view we relied on, among others, *Lynchburg National Bank & Trust Co.* v. *Commissioner*, (C. A. 4) 208 F. 2d 757, affirming 20 T. C. 670. In sustaining the view that the applicable test is the "functional" test, the Court of Appeals said:

To hold otherwise would be to say that the replacement of one commercial building by another commercial building is sufficient under the statute to avoid the recognition of gain, no matter how dissimilar or unrelated their respective purposes may be, and we do not think that the statute has that meaning.

In view of the foregoing the statutory test is not necessarily satisfied by a mere replacement of one industrial property with another or by a mere replacement of one rental property with another because in such replacements the function of the old and the new properties would not necessarily be similar or related in service or use.

At the time the petitioner acquired his interest in the Pittsburgh property in 1947, that property was being used by Epstein in the conduct of a parking lot business thereon. Thereafter for a period of 5 years and until the property was condemned in 1952, the petitioner and his coowner of the property leased it to Epstein to be used for that purpose and Epstein continued to use it for that purpose. The property was especially adapted for such use and since the evidence shows that the rent paid by Epstein was increased 25 per cent effective October 1, 1950, Epstein's operation of the property apparently was profitable.

The record is silent as to what use, if any, American Can Company made of the New Castle property prior to or after 1951 when it began offering the property for sale. However, the evidence shows that there were several buildings on the property, some of which were of substantial construction and were of substantial proportions. Although the buildings were vacant and the petitioner testified that they were not in a tenantable condition at the time Arsenal Corporation acquired the property, the first and only use shown by the record that the petitioner, an industrial realtor and appraiser for 30 years, sought to make of the property was to rent it to Civil Defense for warehouse purposes. That was what it was rented to Civil Defense to be used for. Although it is true that Arsenal expended approximately $100,000 in making repairs, alterations, and improvements on the property which it had acquired at a cost of $155,000, the expenditure of $100,000 was to meet the requirements of Civil Defense which rented and used the property for warehouse purposes.

The fact that an undisclosed portion of the New Castle property, which had an area of more than 25 times that of the Pittsburgh

property, was used for parking purposes by executives, employees, and customers of a corporation conducting business on an adjacent tract at the time Arsenal Corporation purchased the New Castle property, standing alone, fails to establish that the New Castle property was similar or related in service or use to the Pittsburgh property. There is no showing as to the extent of the area of the New Castle property which was used for parking. Nor is there anything to indicate that the use of the portion so used was pursuant to any leasing or other financial arrangement with the owner, American Can Company. The record does not show nor does the petitioner contend that it would have been economically feasible to have devoted the entire acreage of the New Castle property or any substantial portion thereof to parking purposes.

On the record before us we are unable to find that the petitioner reinvested the proceeds of the condemnation award for the Pittsburgh property in acquiring control of a corporation owning property similar or related in service or use to the Pittsburgh property.

*Decision will be entered for the respondent.*